SO ORDERED: October 15, 2013.



Robyn L. Moberly
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

IN RE: )
)
UPTOWN BUSINESS CENTER, LLC. )  CASE NO. 13-8032-RLM-11
)
    Debtor )

# FINDINGS OF FACT AND CONCLUSIONS OF LAW
# ON CREDITOR'S MOTION TO DISMISS

This matter came before the Court on September 26, 2013 and October 3, 2013 for evidentiary hearing upon the *Motion to Dismiss* filed by the secured creditor, Alpha Capital, LLC, on August 1, 2013. The Court heard the testimony of the witnesses, the arguments of counsel and now makes its findings of fact and conclusions of law pursuant to Fed. R. Bankr. P. 7052.

**FINDINGS OF FACT**

    The Debtor, Uptown Business Center, LLC ("Uptown"), is a limited liability corporation whose only asset is property located at 4842 North College Avenue in Indianapolis, Indiana (the "Property"). The Property is a mixed-use property where it has both business and residential tenants. Historically, it has enjoyed a high occupancy rate because it is located in a demographically desirable, up-and-coming area of Indianapolis which caters to young urban residents desiring to live near the area where they work, shop and dine. Leif Hinterberger ("Leif") is the sole member of the debtor. Prior to February, 2013, the Property was managed by Carreau Design Corp. ("Carreau") and paid Carreau $5,000 a month for its services. Carreau is also owned by Leif.

    The financing of the acquisition and renovation of the Uptown in 2005 was financed by Leif and a construction loan in the vicinity of $600,000. Thereafter, the construction financing was replaced with permanent financing obtained through Citibank, N.A. ("Citibank") and Leif personally guaranteed the loan. The Debtor became delinquent in its payments to Citibank in 2009 but was able to raise more cash, settle the deficiency with Citibank, and become current on the loan again. Citibank offered to sell the mortgage note at a substantial discount and Leif contends he was able to put together an investment group but, through the fault of Citibank alone, the note was sold to another investment group. It is irrelevant to these proceedings whether the Debtor was wronged by Citibank's sale of the note to another investor, although Leif makes that claim. The note was sold (again, Debtor contends it was sold wrongfully) successive times at discount until it was purchased by PSB Credit Services, Inc.("PSB"). Despite

2

the debtor's desirable location, financially stable tenants with long term leases, and high occupancy rate, the debtor defaulted on its payments to PSB, a fact Leif disputes. The parties entered into a forbearance agreement giving the Debtor opportunity to find financing to purchase the note at a deeply discounted rate.

The debtor's attempts to obtain financing were unsuccessful.  PSB brought a *Complaint to Foreclose Mortgage* against the Debtor, Leif, as guarantor, and the holders of the junior mortgages on the Property in the Marion Superior Court (the "State Court") and requested the appointment of a receiver in October, 2012.  During the pendency of that action, PSB assigned its interest in the note and mortgage to Alpha Capital, LLC ("Alpha").  Alpha proceeded to prosecute the foreclosure action.  One hour before the hearing on Alpha's *Motion for Summary Judgment* in the State Court, Uptown filed the instant bankruptcy petition, halting the state court proceedings, as to Uptown.  The foreclosure proceedings continued against the guarantor, Leif, and the State Court eventually found that the Debtor was in default of its payments to PSB and entered judgment against Leif on his guaranty.

On November 2, 2012, prior to Uptown's chapter 11 filing, the State Court appointed Smith Equity Partners ("Receiver") as the receiver to oversee the Property. By order of the State Court, the Receiver had collected rents, leased all space in the building, done minor maintenance, had begun addressing the environmental hazard created by the Uptown's immediate neighbor, 60 Minute Cleaners, and had made proper monthly accounting to the court. However, Uptown had no money available to turn over to the Receiver in the form of tenant deposits or otherwise.  The real estate taxes were past due for May 2012 and Alpha eventually paid the delinquent taxes, for

3

which it has not been reimbursed. The water bill on the property had not been paid for at least a year and the utility was threatening to cut off water to the building and its tenants.

The debtor filed this chapter 11 case on July 29, 2013, several months after the Receiver had been appointed. The Debtor expressed strong concerns about the Receiver and filed a *Motion for Authority to Terminate the Receiver* as a first day motion. The Court took evidence on the Debtor's motion and entered an order in open court denying the Debtor's motion on August 2, 2013. Despite his statements that he did not take a salary from the Debtor, Leif did withdraw significant funds from the rents received and it is unclear whether Leif withdrew rent proceeds as "salary" or under another category which allowed him to deny taking a salary in open court. Leif did admit to utilizing rent proceeds from the Uptown to invest in a nearby property he controlled, known as the "49-50 Project". Leif contended that the arrearage in the water bill was a mix-up on the part of the water company and the arrearage was somewhat less than the stated amount. Nonetheless, Alpha paid the water bill so the tenants could operate their businesses. This Court entered an order which allowed the Receiver (now "Property Manager") a management fee of $1,700 per month and denied the Debtor's request to terminate the receiver. The Court also excused the Receiver from turning over the Debtor's property to the Debtor in compliance with 11 U.S.C. 543.

To date, the Receiver, as Property Manager, has remained in possession of the Property and the debtor has not filed a plan or a disclosure statement. Alpha is owed at least $843,344.53, the amount which the State Court determined is owing pursuant to the judgment against Leif, as guarantor, on the note. There are four individuals that

4

hold junior mortgages (the "Junior Lienholders") in the Property. These Junior Lienholders collectively loaned the debtor $200,000, but the amount due currently is unclear, as at least one of them loaned an additional $300,000 that went into the 49-50 Project. The Debtor proposes to pay the Junior Lienholders according to the terms of modification agreements entered into with two of the four Junior Lienholders. The modification agreements provide for a three-tiered payment scheme with minimal initial payment under the first tier and second and third tier payments contingent entirely upon the Debtor obtaining refinancing and further acquiring and developing the adjacent area where the Property is located. However, the Debtor currently has made no payments to the Junior Lienholders. Only two of the four Junior Lienholders to date have signed the modification agreements and the Junior Lienholder owed the most money ($184,000 and possibly much more) has not. There has been no "angel" lender to provide financing for the project, so arguably there was no consideration for the two signed modifications. Therefore, the original balance owed plus interest for all four Junior Lienholders is still owing and the Debtor has not chosen to address that possibility. The outstanding balance of the four notes held by the Junior Lienholders (three of which are now subordinated to one of them) is at least $282,500 (scheduled amount) and possibly as much as $500,000, if the additional loan of $300,000 to develop the 49-50 project is included.

    All of the space in the Property is leased at competitive rates and generates gross monthly income of approximately $10,509, operating expenses of $2,786.00 and net monthly operating expenses, without payment of debt, of $7,723.00. The Debtor has complained of the expenses of the Property Manager and his attorney since the

5

Receiver was put in place by the Marion Superior Court.  The Property Manager was intended to be a temporary measure while the efficacy of this reorganization could be evaluated.   Furthermore, the Property Manager has been successful in paying the delinquent water bill, delinquent taxes and keeping all other expenses it has been ordered to pay current.  Thus, the expense issue is not presently before the Court and not relevant to the current issue.  Rather, the Court is concerned with the Debtor's prior and unsuccessful management of the Property before the Receiver was appointed.  The Debtor has offered no credible explanation why it, with sufficient cash flow, could have financially deteriorated so significantly under Leif's management.

The only unsecured debts listed on Debtor's bankruptcy schedules is a credit card debt of approximately $11,000.00 and a $650,000 debt owed to Leif.

From the testimony at the hearing, the Debtor's prospects for reorganization involve success at litigation the Debtor intends to bring.  The environmental problem caused by the 60 Minute Cleaners , a business immediately adjacent to the Property, was caused by the discharge of dry cleaning solvent.  The debtor has taken initial actions to allow minimal testing to be taken to determine the scope of the problem.  60 Minute Cleaners has insurance which Leif anticipates will ultimately pay for the remediation of the toxic damage.  Leif is hopeful that at some point in the future Debtor will have a cause of action against the 60 Minute Cleaners which will result in significant compensatory damages.  He is also optimistic that these damages will be in an amount to resolve much of the Debtor's financial woes.  If allowed to obtain control of the Property, the Debtor intends to use some of the cash flow from the building to address the environmental issue and to sue the 60 Minute Cleaner.

Leif has also indicated that, if permitted to manage the Property, he intends to use some of the cash flow to sue Alpha for unspecified lending violations.  Again, his contention is that he will be successful in such a suit and it will resolve the Debtor's financial distress.  Alpha has a perfected security interest in the rents of the Uptown. Any claim against Alpha which Uptown or Leif might have would be considered a compulsory counterclaim in the suit on the note brought against them by Alpha.  The State Court has granted partial summary judgment against Leif, as guarantor of the Uptown note, and so the counterclaim was either not plead in that case or it was defeated at summary judgment.  Furthermore, there was evidence that Leif and the Debtor signed a forbearance agreement that released any claims they may have had against Alpha.

## Discussion
### *Dismissal under §1112*

A creditor or party in interest may move for dismissal of a chapter 11 case "for cause" under 11 U.S.C. §1112(b).  Section 1112 was amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA") and subsequently amended by the Bankruptcy Technical Corrections Act of 2010.  *In re Attack Properties, LLC,* 478 B.R. 337, 341, n5 (N.D. Ill. 2012); *In re Sparkle Stor-All Eaton Township, LLC,* 2011 WL 4542709 at *3 (Bankr. N. D. Ohio September 28, 2011). The 2005 amendments added §1112(b)(4) which contains an illustrative and non-exhaustive list of scenarios that constitute "cause" to dismiss a chapter 11 case.  The bankruptcy court has broad discretion to dismiss a chapter 11 case and undertakes a case specific factual inquiry to determine whether "cause" exists. I*n re Creekside Senior Apts., LP,* 489 B.R. 51, 60 (B.A.P. 6th Cir. 2013).

7

The movant bears the burden of proving by a preponderance that "cause" to dismiss exists. The 2005 amendments provided that "unusual circumstances" establishing that dismissal was not in the best interest of the creditors and the estate could prevent dismissal of the case. The 2010 technical amendments narrowed the availability of the "unusual circumstances" defense. *Sparkle* at *3. Section 1112(b)(1) now provides that, once the movant meets that burden, the court "must" dismiss the case for cause unless the court finds that the appointment of a trustee or an examiner under §1104 is in the best of the creditors and the estate. Section 1112(b)(2) provides that the court may not dismiss a case if the debtor comes forward to rebut the showing made by the movant by establishing that there is a reasonable likelihood that a plan will be confirmed within applicable time frames and that acts or omissions that are the cause for dismissal were reasonably justified and will be cured within a reasonable amount of time fixed by the court. *Id.*

The unlikelihood or the impossibility of a debtor being able to file a confirmable chapter 11 plan and reorganizing is contemplated by at least three enumerated "causes" set out in §1112(b). Section 1112(b)(4)(A) provides that "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation" is "cause" to dismiss. The "failure to file a disclosure statement, or to file or confirm a plan, within the time fixed by this title or by order of the Court" is another cause to dismiss a chapter 11 case under §1112(b)(4)(J). Finally, a debtor's "inability to effectuate substantial consummation of a confirmed plan" may be cause for dismissal under §1112(b)(4)(M). Dismissal is appropriate where "further suspension of the creditor's rights in order to allow a debtor to reorganize would be futile as there has

8

been no progress in that direction and there was little prospect of future progress". *Attack Properties*, 478 B. R 344.  See also, *Creekside*, 489 B.R. at 59 (dismissing chapter 11 case where third party's commitment to fund plan was "illusory" and debtor did not prove that it had a reasonable likelihood of "rehabilitation").  "Cause" to dismiss likewise exists for a debtor with not even a minimal chance of proposing a plan that would satisfy the statutory confirmation requirements under §1129.  *In re Garcia*, 479 B.R. 488, 493 (Bankr. N. D. Ind. 2012).

### *"Single Asset Real Estate" Debtors and "Bad Faith"*

Alpha alleges that the Debtor is (1) a "single asset real estate" debtor and that (2) this chapter 11 case was filed in bad faith, warranting dismissal.  The debtor did not designate itself as a "single asset real estate" [1] debtor when it filed its petition.  Prior to 1994, courts had developed criteria for dismissing chapter 11 debtors that were formed solely to own and operate one parcel of real estate, recognizing that such cases typically involved only one lender, no employees, property management farmed out to a management company, and few trade creditors.  Provisions for "single asset real estate" debtors were added to the bankruptcy code by the 1994 amendments because existing code provisions did not adequately address the unique dynamics of such cases.  Typically, a "single asset real estate" chapter 11 case was precipitated by a default with the secured lender, the only real creditor in the case.  The chapter 11 was really a two party dispute, and because of that fact, the 1994 amendments put such debtors on an

---

[1] "Single asset real estate" means "real property constituting a single property or project, other than residential real property with fewer than 4 residential units, which generates substantially all of the gross income of a debtor who is not a family farmer and on which no substantial business is being conducted by a debtor other than the business of operating the real property and activities incidental thereto".  11 U.S.C. §101(51B).

9

expedited reorganization track.[2]  To that end, §362(d)(3) was added and provides that a secured lender's request to lift the automatic stay, after notice and hearing, will be granted unless the debtor, within 90 days of the petition date, has filed a plan with a reasonable possibility of being confirmed within a reasonable time or the debtor has commenced payments equal to the secured lender's applicable nondefault contract rate of interest.

Although not expressly provided for in §1112(b)(4), a debtor's "bad faith" in filing the chapter 11 case constitutes "cause" for dismissal under §1112.  *In re Piazza*, 719 F.3d 1253, 1263, n6 (11th Cir. 2013*); In re PM Cross, LLC*, 494 B.R. 607, 618, n9 (Bankr. D. N. H. 2013).  The filing of a chapter 11 case by a single asset real estate debtor is not, by definition, a bad faith filing, given the addition of §362(d)(3) which contemplates that such filings will occur.  See, *In re LCGI Fairfield, LLC*, 424 B.R. 846, 851 (Bankr. N. D. Cal. 2010).  Prior to the 1994 amendments, courts used a "totality of the circumstances" approach to determine whether a debtor with only one significant asset filed the chapter 11 case in good faith.  *In re Castleton Associates Limited Partnership*, 109 B.R. 347 , Ltd.  *In re Grieshop,* 63 B.R. 657 (N.D. Ind. 1986).  That "totality of the circumstances" test continues to be relevant.  The filing of a single asset real estate case may be in bad faith where (1) the debtor has few or no unsecured creditors; (2) there has been a previous bankruptcy petition by the debtor or a related

---

[2] Prior to the Bankruptcy Reform Act of 1994, the Bankruptcy Code lacked an express provision for single asset real estate case. The 1994 Act provided special treatment of single asset real estate by defining the term "single asset real estate in Bankruptcy Code Section 101(51B) and by placing single asset real estate cases on an expedited reorganization track through the enactment of *404 Bankruptcy Code § 362(d)(3)." *In re Kkemko, Inc.,* 181 B.R. 47 (Bankr.S.D.Ohio 1995); H.R. Rep. 103–835, 103 Cong.2d Sess. (1994). When first enacted, the definition of single asset real estate included a limitation to debtors with secured debts of no greater than $4 million. That limitation was removed as part of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"). *In re Kara Homes, Inc.,* 363 B.R. 399, 403-04 (Bankr. D.N.J. 2007).

entity; (3) the debtor has engaged in improper pre petition conduct; (4) the petition allows the debtor to evade court orders; (5) there are few debts to non moving creditors; (6) the petition was filed on the eve of foreclosure: (7) the foreclosed property is the sole or major asset of the debtor; (8) the debtor has no ongoing business or employees; (9) there is no possibility of reorganization; (10) the debtor's income is not sufficient to operate; (11) there was no pressure (to dismiss the case) from non moving creditors; (12) the debtor's reorganization essentially would involve the resolution of a two-party dispute; (13) a corporate debtor was formed and received title to its major assets immediately before the petition and (14) the debtor has filed the chapter 11 case solely to invoke the automatic stay.  *Grieshop*, 63 B.R. at 663; *In re MGN Co., III*, 116 B.R. 654, 658 (Bankr. S. D. Ind. 1989).

### *Likelihood of Rehabilitation / Confirmation of Plan*

The court concludes that the Debtor is not likely to be rehabilitated through this chapter 11 process. The Debtor's reorganization here in part is contingent upon success in litigation against 60 Minute Cleaners, recovery of which is speculative and remote at best. Further, a building with known environmental issues is at best "very hard" to finance. Both appraisers agreed that finding financing for this building would be difficult. Likewise, finding a buyer for the building is equally difficult. In any event, this potential claim is so speculative and remote that it cannot be considered by the Court in determining whether there is a likelihood of a successful reorganization of this debtor. Likewise, any recovery from potential litigation against Alpha is speculative and remote, given findings made by the State Court against Leif on his guaranty and the forbearance

11

agreement between the parties in which the Debtor and Leif acknowledged that Alpha was entitled to enforce the note and its right under the mortgage.

The Debtor currently does not have the economic wherewithal to reorganize. The non-default interest, with no payment of principal to Alpha, is $4,052.70 per month. The amount owed to the Junior Lienholders ranges between the scheduled amount of $282,500 to over $500,000, and most likely closer to the high end of that range since there was testimony that one of the Junior Lienholders loaned an additional $300,000 that was used for the 49-50 project. The non-default rate under the notes with the Junior Lienholders is 15%. Using even the lower range of $282,500 as the Junior Lienholder debt, the interest payment alone to the Junior Lienholders is at least $3,531 per month. The monthly interest payments alone to all secured creditors, using the non default interest rate, is no less than $7583.70 a month. Leif's projection of annual gross income was $126,109, which is in line with the Property Manager's estimates and the historical data. Leif also projects that the annual operating expenses are $13,647 which covers electric, water, trash, taxes and insurance. These projections result in annual net operating income of $112,462, or monthly net operating income of $9371.83. However, his net operating expense projection fails to account for essential expenses such as maintenance, professional fees (such as bookkeeping and accountant fees for tax return preparation), property management fees and lease agent fees. Despite the fact that Leif has offered to manage the Property with no management fee, his projections still fall short because there is no allowance for property maintenance, repairs, professional fees, contingencies or a capital reserves. Even with 100% vacancy at competitive rental rates, and after factoring in necessary expenses that are

12

not accounted for in Leif's projections, the Debtor will be unable to pay the non default interest to all secured creditors, let alone interest and principal.

The Debtor's and Alpha's appraisers valued the Property at $1,300,000 and $875,000 respectively. The huge disparity between the two values is due to a difference in valuation methods and cap rates applied. Both appraisers used an income approach but the debtor's appraiser "tempered" that approach with a market approach which compared sales of comparable properties. None of those comparable sales involved mixed use properties as the Property here. Alpha filed its proof of claim on September 20, 2013 in the amount of $888,838.01. That claim includes some, but not all, of the attorney fees incurred by Alpha enforcing its rights under the note and mortgage. Even if the Court were willing to value the Property at a bit higher than $875,000, whatever value it arrived at would not create a significant equity cushion.

If the Debtor were to file a plan containing terms similar to those discussed at the hearing, it would be difficult for the Debtor to meet the confirmation criteria under §1129. Alpha would be classified separately and would not vote in favor of confirmation. Leif's unsecured claim would not be counted for voting purposes because he is an insider. See 11 U.S.C. §1129(a)(10). It is only speculative whether the four Junior Lienholders would vote in favor of the plan. Even if the credit card creditor were impaired and voted in favor of the plan, the plan most likely would not be confirmed under the "cramdown " provisions of §1129(b)(2) because it would not meet the criteria set out in §1129(b)(1). Furthermore, given the failure to account for essential expenses in its projections, the debtor's plan would not be feasible and there is a good chance that there would be a need for further financial reorganization under §1129(a)(11).

Pre petition, Alpha or its successor gave the debtor ample opportunity to discount the amount owed on the note and to find alternative financing. A related entity of the Debtor – the owner of the 49-50 Project – likewise filed a chapter 11 with the same strategy and failed. The chapter 11 was filed the same day as the summary judgment hearing in State Court and was filed to avoid the entry of summary judgment against the Debtor. The Debtor has two unsecured creditors, one of which is an insider who holds 93% of the total unsecured debt. The Debtor has no employees. The Debtor's chances for reorganization are pinned on illusory recovery in litigation. There is no evidence that the Debtor can obtain alternative financing or infusion of capital in the immediate future. It was mismanagement of the Debtor that prompted the Debtor's financial woes with Alpha. The Court finds that this is essentially a two party dispute that should be adjudicated in State Court. Alpha has borne its burden of showing that "cause" exists to dismiss the case under §1112(b) and the Debtor has not come forward with credible evidence to establish there is a reasonable likelihood that a plan will be confirmed with a reasonable amount of time. Appointment of a trustee or an examiner would be futile in this two party dispute. Accordingly, the court GRANTS Alpha's motion to dismiss.

# # #

Distribution:
John Waller/ Matthew Millis, Attorneys for Alpha Capital, LLC
Robert Cheesebourough, Attorney for Uptown Business Center, LLC